We will hear argument next in Case 22-555, NetChoice v. Paxton. Mr. Clement. Mr. Chief Justice, and may it please the Court. I don't want to proceed as if I wasn't here for the first argument, so let me focus on what's different about Texas. One thing, fortunately, that's different about Texas is its definition of social media platforms excludes websites. So we can just put that Gmail issue to one side for when we're talking about Texas. The other thing it excludes, of course, is websites that are primarily focused on news, sports, and entertainment. In the First Amendment business, we call that content-based discrimination, and that's just one of the many reasons that this statute is, dare I say it, facially unconstitutional. The other thing that's different is, in some respects, this statute operates more simply because it forbids my clients from engaging in viewpoint discrimination. Now, we're used to thinking that viewpoint discrimination is a bad thing and that governments shouldn't do it, and, of course, when governments do it, it is a bad thing. But when editors or speakers engage in viewpoint discrimination, that is their First Amendment right. It is also absolutely vital to the operation of these websites, because if you have to be viewpoint neutral, that means that if you have materials that are involved in suicide prevention, you also have to have materials that advocate suicide promotion. Or if you have materials on your site that are pro-Semitic, then you have to let on materials onto your site that are anti-Semitic. And that is a formula for making these websites very unpopular to both users and advertisers. So it is absolutely vital. The other thing that makes Texas a little different is, at least in passing the law, Texas was even more explicit in relying on the common carrier analogy. As if simply labeling websites common carriers makes the First Amendment problems go away. And that is fundamentally wrong for two basic reasons. One, these companies don't operate actually as common carriers. They all have terms of use that exclude varying degrees of content. And, second, Texas can't simply convert them into public common carriers by its say-so. I welcome the Court's questions. Mr. Clement, if these laws go into effect, how would your clients, what steps would they take to comply? So, I mean, you know, one thing that they would... I'm sorry, just in particular addressing the situation of compliance in Texas and Florida as opposed to nationwide. Sure. So, I mean, you know, one of the things that they would contemplate, at least, you know, with respect to Texas in the first instance, is there some way to just withdraw from the market in Texas and Florida? And, of course, Texas had that in mind in the statute and specifically said, we essentially have to do business in Texas and we can't discriminate against users based on their geographic location in Texas. So, if we lose this, including, you know, the idea that we can be forced to engage in expressive activity in Texas, then I think we would fundamentally have to change the way that we provide our service in order to provide anything like the service that we want to, while not engaging in viewpoint discrimination. We basically have to eliminate certain areas of speech entirely. So, we just couldn't talk about suicide prevention anymore because we're not going to talk about suicide promotion. I guess we couldn't have pro-Semitic speech because we're not going to have anti-Semitic speech. So, we'd have to figure out some way to try to engage in even more content moderation or editorial discretion to try to get us to a level where we're more benign and somehow we don't run afoul of Texas's law. And then on the disclosure provisions, the record here reflects that, you know, YouTube would have to basically increase its disclosure and appeal process basically 100-fold in order to comply with Texas law. I mean, I'm happy to talk more about the common carrier issue because I do think it's a central part of their defense. There was an allusion earlier about somehow Section 230 treats my clients, the websites, as common carriers. To the contrary, Congress specifically, and this is 47 U.S.C. 223 subsection 6, which we cite in our briefs, it specifically is a congressional provision in the same act of Congress that says that interactive computer services should not be treated as common carriers. And I think more broadly the whole thrust of 230 is don't just be a common carrier. Don't just put through all of this material. We don't want that. We want you to exercise editorial discretion in order to keep some of the worst of the worst off the site. Not that though only with, all that's true, and I acknowledge all that, but it also says that's true only if it's not your speech. And that seems to be in tension a bit with your suggestion that everything is your speech. And I think Justice Barrett pointed out an interesting feature of that, which is these algorithms arrange, sort, promote certain posts by users and not others. And is that not your, not yours, but your client's speech? So I don't think it's our speech in the way that section 230 talks about the speech. And I think for these purposes you have to distinguish between the speech that is the editorial function and the underlying user speech. I understand that. And I didn't mean to suggest otherwise. But there is some editorial speech, your term, going on, right? I think that's right. And so the carrier would be liable for its editorial speech. I don't think so. I mean, you know, I did actually reread the brief that I filed, at least in the Gonzales case, and I think that you could make a strong argument based on the text of that statute that that kind of editorial sort of functioning is not something that causes you to lose your 230 protection. So it's speech for purposes of the First Amendment, your speech, your editorial control. But when we get to section 230, your submission is that that isn't your speech. Yes, as a matter of statutory construction, because otherwise section 230 ends up being self-defeating. Because, again, the whole point of section 230 was to promote that editorial discretion. And this court wrestled with these issues. They're hard issues. And I certainly applaud the instinct that you shouldn't resolve them here. But I don't think just by recognizing that my clients are engaged in editorial discretion when they make those decisions about what's going to ultimately go to the individualized screen that a user's going to see when they tap into their website or their application. I don't think that's the kind of speech that you're talking about in the 230 context. And if you did, I think you would defeat the fundamental purpose of 230, because they wanted you, they wanted my clients and others to exercise that editorial discretion to keep the bad material out. With respect to other people's speech. So it seems like we have speech, and then we have speech. You can't literally, and this is, again, I'm happy to argue that case right now if we want to, but you can't have. Well, no, it's a very hard question for us, and it's perfectly relevant here and very important because, of course, 230 preempts things. And we don't know how much of this law it preempts. Absolutely. But this law is unconstitutional in all its applications, and certainly it has no plainly legitimate sweep. So you don't have to reach the 230 question directly here. And I would simply say that when you're reading those statutory terms in 230, you wouldn't sweep in editorial discretion, because if you do, you will defeat the fundamental purpose of Section 230, which is to empower editorial discretion. I just wanted to raise with you the question I raised with the Solicitor General, who offered a thoughtful response. But many of your clients' terms of service, while reserving some editorial discretion, and I think about most of them as speaking about the things covered by 230, obscenity, et cetera, go out of their way to promise an open forum to all members of the public and go out of their way to say we don't endorse what other people say on this site and go out of their way to say all views shall flourish. Now, that's not true for all of your clients, but it's true for some of them and many of them. What do we do about that? So I would say that it's true of some of my clients and some more than others. And I think all of those terms of service, as the General said, go on to say, and there are certain things, though, that are out of bounds. And I do think it's just a factually true thing that my clients in the main, as long as you kind of stay within the lines, they actually do want to promote an open dialogue and a fair dialogue. And if you look at the Center for Growth and Opportunity brief, it shows you that actually some conservative voices have really flourished on these websites. Ben Shapiro and Daily Wire are killing it on Facebook. And that shows you that we do want a broad discussion, but there's some stuff that is just out of the lines. And I don't think it's as simple to say, well, that's just the 230 stuff, because, again, we had a debate about what otherwise objectionable means. But I also think that my clients are getting a lot of pressure to be particularly careful about things that are damaging to youths. And I think in that context, they want to sort of err on the side of keeping some bad material off. Well, you mentioned that a few times. Let me just press the other way, though. Doesn't it also hold that, on your view, part of the editorial discretion of a platform would be that it could use algorithms designed specifically to try to attract teens to addiction or suicide, depression, those kinds of things as well? That would be part of their editorial discretion, too. So a website, I don't think my clients, because my clients are working hard. I don't mean to cast aspersions on anyone, but I think it's a natural consequence of your position, isn't it? There would be protected First Amendment activity with that very different website with a business model that I don't think would stay in business very long. And it is possible, as the United States has pointed out in its brief, that if you have a different concern and you identify a different government interest, that maybe the government might be able to do something, particularly if it does it in a content-neutral way, to address some of those concerns. But to get back to something Justice Kavanaugh pointed out before, I actually think that both Texas and Florida have been pretty aggressive about their government interest here being something that is not just not a legitimate interest in the First Amendment context, but is affirmatively prohibited, which is the idea that we're going to amplify some voices and we're going to put burdens on private parties so that some voices can be louder than others or some people can get a boost from what they're getting in the marketplace of ideas. And the only place this Court has ever allowed that was in Turner. And Justice Kavanaugh, you pointed out that one of the key things there was content-neutral, but I actually think the critical thing in Turner is that bottleneck or chokehold on the content that went into individual houses. And I think that's what made what was otherwise an impermissible government interest a legitimate government interest in that narrow context. And maybe you could say the same thing, I mean, I don't know if red line is still good law, but that's the same idea that there's like a scarcity rationale. But there's no scarcity rationale in the Internet, and this Court said that in 1997 in the Reno case. I'm sorry, can I ask you about a distinction between two possible kinds of applications of the Texas law? So one is the application that prevents you from keeping out certain speech that you want to keep out. You said anti-Semitic speech, it could be any of a number of things. As I understand it, the Texas law prevents you also from doing something else, which is suppose you wanted to prevent anti-Semites from posting anything. You just wanted to say that they're a class of people, we're not even going to let them post cat videos. Should we think about that set of applications differently? I don't think you should think of it radically differently. I mean, it's a different application, but I think it's the same idea, which is there are some speakers, and I think this is going to be very few, but there are some speakers where they are so associated with a particular viewpoint that it informs essentially all of their speech, and it also affects the speech of other people in the forum. If you have a white supremacist on your speech forum, and they're posting there, it's going to cause a lot of other people to say, what is that person doing? What's going on here? Why are all the dog photos white? I mean, it's going to fundamentally change the dynamic on the website, and I think a website that's trying to promote a particular discussion has a First Amendment right to exclude those people, and in practice, this is what is used to exclude sexual predators, which is something, again, that the government can't do, Packingham, but Facebook does, and there are certain other people with very distinct viewpoints where, in a sense, we know the viewpoint is problematic even if the particular post is not. But Mr. Clement, I just wanted to follow up on that because it seems to me that Justice Kagan's question kind of gets to the distinction in 303 Creative between turning people away and the speech that you have, and so if you think about it as silencing someone who you let on your platform, then that seems more like speech or content moderation to the extreme, for example, but I assume that the implication of your answer to Justice Kagan is that you could tell the anti-Semite, we're not open for business to you, right? You can tell that person that our speech forum is not open to you, and I think that's what makes it different, that Texas is focused really on these speech-oriented platforms, and so I think if you're in the business of speech, and you have somebody, and again, this is not sort of other prohibited statuses, this is viewpoint, and so you are a notorious anti-Semite. We do not want you to participate in this conversation. Religion, then. Sure, and I want to have a Catholic website. I can keep off somebody who's a notorious Protestant. I mean, I want to preserve the nature of the discussion on my forum, and it's a private forum, and the government can't tell me, as a private party, let the Protestant into the Catholic party. I don't think so. Mr. Clement, can I ask you about Section 2? I don't think anything has been said about it so far. So you say that Section 2's individualized explanation requirements violate the First Amendment because they impose a massive burden, right? That's your argument. I mean, it seems to me that the European Union has imposed exactly the same, pretty much the same individualized explanation requirement on anybody who operates there that Texas has imposed, and I'm not saying that whatever the European Union says is okay is constitutional here, but just on the practical question of whether it's too much of a burden, if it's not too much of a burden for your clients to do it in Europe, how can it be too much of a burden for them to do it here? So as I understand the requirements, they are different. They are materially different. In a sense, the European Union provision has sort of a built-in kind of reasonably practical provision right into what you have to do. You only have to do what's reasonably practical. This is an absolute requirement to respond to every takedown, and that would be over a billion takedowns of comments in a quarter for YouTube. And then there's also this appeal process, which I don't think is coextensive with the process in Europe. So just as a practical matter, I think this is more burdensome, but as you said, the First Amendment does not apply in Europe, and I think that having this kind of disclosure requirement on what is really an editorial discretion decision is potentially, I mean, hugely problematic. I mean, if you took this and said, you know, the New York Times, you have to tell us why you rejected my wedding announcement. I mean, you only take like 10% of the wedding announcements you have to tell me. Even if you automized that and sort of said, you know, well, one, if you weren't rich enough, two, if you weren't connected enough in New York social circles, and three, we just didn't like the way you looked. Some of your clients are humongous, and if you want to say this is unduly burdensome, then you have some obligation in the district court to try to. It's enough for you to just say this is a huge burden, so knock this out. Didn't you have to provide something to show how much, what resources would be required? We did. And why that would be too much for these megaliths? I mean, we did. There's more of a record in the Texas case than in the Florida case. Our, you know, the witness for YouTube in their declaration specifically said this would be 100 times more burdensome than their current process. And so there is a record on this. It is incredibly burdensome. Mr. Thomas, anything further? Mr. Salido? The 230 argument is intriguing to me, and it's the distinctions that you're drawing somehow to some degree escape me. So is it your position that you are exercising editorial discretion as to everything, let's take YouTube, as to every video that is placed on YouTube, you have exercised editorial discretion that you want that on YouTube? I would say that we have exercised some editorial discretion to not sort of eliminate that from the site entirely. And as to an individual user, we've used what are typically, in many cases, neutral algorithms, but some of them are not neutral. And even in Tomna, the briefs, I think, made quite clear that, you know, although at a certain point some of the algorithms were neutral, as between Rice Piloff and terrorism, there were other efforts to affirmatively get terrorist stuff off of those sites. And so there are... I mean, if you were a newspaper and you published the content that appears in every single one of the videos on YouTube that you allow to be included, you would be liable, potentially, for the content of that material. And I don't understand the rationale for 230 if it wasn't that you can't be held responsible for that because this is really not your message. Either it's your message or it's not your message. I don't understand how it can be both. It's your message when you want to escape state regulation, but it's not your message when you want to escape liability under state tort law. So I don't really think we're being inconsistent, and I would try to draw the analogy just to a good old-fashioned anthology. If I put together an anthology of 20 short stories, everybody understands that the underlying short stories are still the product of the individual author, but as the anthologist, as the editor of this compilation who decided which 20 got in, which ones didn't, I'm responsible for those editorial discussions, those decisions. Those are both protected First Amendment decisions. You can distinguish between the underlying material and the editorial decisions. Now, at Common Law, the publisher was responsible for both, and so they were still liable for republishing the author's work, and that's precisely what Congress wanted to get rid of in 230, and they wanted to essentially give our clients an incentive to weed out of the anthologies the stuff that was harmful for children and problematic, and that's why I don't think it works to say, oh, well, then that's your speech, so you're liable under 230, because it's that editorial control, the weeding out the bad stuff. That was the whole point of 230, to empower that. Well, I don't know how a publisher could be liable for, well, I take that back for fiction, but certainly if it was, I mean, if you, back in the day, when some written material was considered to be obscene, you put together an anthology that included obscene material, you could be sued. Today, if you put together an anthology of essays, nonfiction writing, and there's defamation in there, then the publisher could be sued. Well, we exercise editorial discretion. That doesn't shield you from liability. Not a common law, and that's why Congress had to come in with 230, but what Congress did is it looked at the common law, and it said, oh, this is problematic, because the only way you can avoid liability at common law is if you act as a conduit and let everything out, and once you start keeping out a little bit of porn, then you're responsible for the porn that slips through, and that's not practical on the Internet, and that's why we have 230. I don't want to belabor the point. Let me just say something about the analogies that both sides draw to the issues that were presented in prior cases. So you say this is just like a newspaper, basically. It's like the Miami Herald, and the states say, no, this is like Western Union. It's like a telegraph company, and I look at this, and I say, it's really not like either of those. It's worlds away from both of those. It's nothing like a newspaper. A newspaper has space limitations. No matter how powerful it is, it doesn't necessarily have the same power as some of your clients, but put that aside. Newspapers overtly send messages. They typically have an editorial. They may have an editorial 365 days a year, or more than one, but that's not the situation with even the most prominent of your clients. So I don't know how we can decide this case by jumping to one side or the other of this case law. Well, just let me offer two thoughts. One, this isn't the first time you're wrestling with the Internet. You wrestled with it in Reno. You wrestled with it last term in 303 Creative, and I think the gist of those cases is this is more like the newspaper or the parade organizer than it is like a common carrier. And then as to the cases, whether you think that this is different from a newspaper, I mean, the arguments that you're pointing to to say this is different are the arguments that those cases wrestled with and said didn't matter. So I know you know this, but in Torneo, there was all this language about it being a monopolist, and that was in the context of a local political election, where if you couldn't get into the Miami Herald, like, where else were you going to go? And yet this court said that didn't matter. And also in Torneo, this court said, yes, space constraints, there are some, but our decision doesn't turn on that. And then in Hurley, there's a lot of language in the court's opinion that says, you know, this is not like much of a message, and they let some people show up even if they get there, like, the day of, and the only thing they're doing is, like, excluding this group. But, of course, the exclusion was the message that they were sending, and it's the message the state was trying to prohibit, and that's kind of the same thing here. If, let's say, YouTube were a newspaper, how much would it weigh? Well, I mean, it would weigh an enormous amount, which is why in order to make it useful, there's actually more editorial discretion going on in these cases than any other case that you've had before you. Because, you know, people tend to focus on the users that get knocked off entirely and end up on the cutting room floor. But both these statutes also regulate the way that these social websites, they sort of get you down to something that's actually usable to an individual user. And, in fact, if you tried to treat these entities like a true common carrier, so first in, first out, just order of, you'd open up one of these websites, and it would be gobbledygook. Half the stuff wouldn't even be a language you understood. And even if you controlled for that, you'd get all this garbage you didn't want. All right. Thank you. I'd like to go back to the individualized explanation requirement. And please remind me, what did the district court do here? Did it grant you an injunction here? It did. And it was the circuit court who didn't. Yeah. So it was the district court who looked at the amount of material you submitted, and I know your declaration, YouTube, said it would be a burden 100 times more than it does now. I don't know what the quantification of that, whether that was quantified or not. Was it? What, 100% more, 100% more costly, 100% more what? 100% more of its current effort, its current sort of, you know, efforts of dedicated. Yeah. But we still don't know what the cost of that is and what. Yeah, I mean. Yeah, there's a lot of unknowns. But this was a facial challenge with respect to that. And Texas seems to say you don't need to do much. You just need to have the computer spit out one through ten reasons. And if you have a few individualized ones, you could just explain those individualized. What do we do with that dispute? So first of all. Because it is a facial challenge. It is a facial challenge. It is a preliminary injunction. We've obviously been over some of that. Here there wasn't just declarations. There were depositions taken. There was a record that was put together on all of this. And Texas was taking a slightly different view of what the burdens of Section 2 were there. And so I think on that, if you just look at the record that was before the district court, you should affirm the district court's preliminary injunction. What I would say, though, is I also think that even what they say on page 44 of their red brief is that, you know, you can do this in a relatively less burdensome way as long as your editorial policies are sufficiently specific and particularized. And what they're basically saying is, you know, you could change your editorial policies a little bit to make it easier to comply with this disclosure obligation. And that seems to be easier. That begs the question, right? Yeah, exactly. Because they're affecting. Okay. Mrs. Kagan? I just have a quick question. So part of the dynamic that I think is going on in these cases is the fact that this regulation is enacted by the democratically elected representative of a state. And I suppose that if the state's regulation of these platforms gets too burdensome, then presumably the platforms can say, forget it. We're not going to operate in your state. And then the citizens of the state would have the chance to determine if that's what they really wanted. That's sort of how I'm looking at this at a meta level. So what caught my attention was your response to the Chief Justice when you suggested that your client couldn't withdraw from the state of Texas because you read the provision related to censorship and geography as ensuring that you don't do so. I had not read that provision in that way. So can you say more about why that's your interpretation? Sure. I think that's the obvious interpretation of that provision, particularly when it talks about, you know, this isn't like, you know, don't discriminate against Texans or Texans wherever they are. The fact that it's particularly preventing us from discriminating on somebody with a geographic location in Texas is basically telling us that we can't try to geofence our service and try to essentially, you know, explain to the people, you know, sometimes like if you get like your cable service has a dispute with the provider and you can't get your football game and they tell you if you're hacked off about this, you know, call this number and complain. We can't do that in response to this law. And I think the legislators in Texas were able to tell their constituents, don't worry. You know, if you like your website, you can keep it. We're not going to threaten. They can't pull out of here based on the way that we're regulating them. So even if we could read it a different way, you're saying this necessarily. I mean, I guess this also dovetails with my concern about us not having sort of state interpretations or an application here to really understand. Because I could read this differently. It seems to me it's fitting into the whole set of things you're not allowed to do. You can't censor people on the basis of the viewpoint of the user. You can't censor them on the basis of the viewpoint that is being expressed. And you can't censor them based on their location in your state or another part of the state. And so I guess I don't necessarily see that in the same way. I mean, you can't just automatically do that, I guess. I don't know. It seems to me quite clear that it's designed essentially as a poison pill or somebody described it as the Hotel California provision. That you can't leave Texas, even if you want to try to do that, as a way of showing that this is an impermissible way of regulating our expressive activities. And, you know, so I do think that is the right reading. I do think the fact that it's geographical location in Texas is kind of a clue to that. So this is not something where, you know, if you're a Texas fan, you're protected no matter where you go in America. This really is designed to sort of say that you can't do the kind of geofencing that you might otherwise do to comply with an idiosyncratic state law. I should mention just for the sake of completeness that, you know, in the lower courts, not part of the preliminary injunction, there are dormant commerce clause challenges to these provisions and the way that this is just kind of one state trying to regulate everybody. And so that's part of the case that will be there. But it's not here. But it's not here. All that's here is a preliminary injunction that runs to my clients. So, I mean, you know, this statute has a smaller universe of people, but if there's somebody else out there who, you know, isn't one of my clients, who isn't covered by this preliminary injunction, the statute could take effect as to those people, and the same is true in Florida. Thank you. Thank you, counsel. Senator Preliger. Mr. Chief Justice, and may it please the court, I want to pick up with the question that Justice Alito asked in the seriatim round to my friend about the idea that the social media platforms don't perfectly fit into either analogy or paradigm here, and I want to acknowledge the force of that intuition. They obviously operate at a massive scale that goes beyond any particular parade or beyond any particular newspaper. I think the right thing to do with that intuition is to recognize that it's not like you can just exempt them from the First Amendment. They are obviously creating something that's inherently expressive in taking all of this quantity of speech on their websites and curating it and making selectivity decisions and compiling it into a product that users are going to consume. So the First Amendment applies, but I think that those kinds of concerns about how the social media platforms and how they look somewhat different from the other kinds of expressive products this court has reviewed in prior cases can come into the question of whether the First Amendment is satisfied with respect to any particular regulation. Now here we think it's not satisfied because of the way that Texas has designed this law. I'd urge the court to rule narrowly. It's not necessary here to try to figure out how the First Amendment applies to new technology in general or to every possible website or the Internet in particular. This law has a very clear defect. What Texas has done is try to countermand the protected editorial speech decisions of the platform, and the only justification it's offered to the courts below is that it wanted to essentially amplify the voice of users on that platform by suppressing the platform's own protected speech. That is a defect that is clear under the First Amendment, and the court could say only that and resolve this case. I welcome the court's questions. General, when I asked you about the difference in treatment of the private party as opposed to the government engaged in similar conduct, your answer was, of course, that it would be different. The government would be bound to comply with the First Amendment. There was some discussion in a number of the amicus briefs about instances in which the government and the private party, say petitioners here, and the government coordinating efforts. How would you respond to that? Let me respond to that by saying I think the position we're offering here and the position this court will consider next month in the Murphy case are entirely consistent. We, of course, acknowledge that if the government actually coerces the platforms and takes over their editorial decision-making, then the platforms could be deemed a state actor, and that would be subject to First Amendment scrutiny. We vigorously dispute that that has actually happened, and the federal government has engaged in that kind of coercive conduct, and we further dispute the legal standards that were applied in that case. But there's no inherent tension here. You know, the federal government obviously can act and criticize the social media platforms' content moderation decisions. That's just using the bully pulpit to express views. And if the states disagreed with how the platforms were exercising their content moderation standards, it could have done the same. It could have criticized them. It could have urged them or tried to influence them to adopt separate standards. But here what the state did is said we're going to pass a law that actually takes over their content moderation and dictates that it has to be done in a different way. General, Texas's law, even more than Florida's, can be understood as an expansion of public accommodations laws, and the United States is often in a position of defending public accommodations laws and insisting that they be vigorously enforced. And how do you see what Texas is trying to do as consistent with that broader stance about public accommodations laws? Yes. So I want to be very clear and stake out potentially some separate ground from my friend representing the platforms in this case with respect to generally applicable public accommodations laws that protect based on a particular status. We think, of course, those laws are valid on their face and that they serve compelling governmental interests. And so to the extent that you're looking at how an ordinary public accommodations law operates, the refusal to deal, the refusal to serve, as Justice Barrett said, we think that's a regulation of conduct and that ordinarily there would be no First Amendment problem with the application of that law. Now, I acknowledge that it gets more complicated when those laws are applied to a business that is providing an expressive product, and cases like Hurley or 303 Creative show that in certain applications, sometimes the public accommodations law has to give way to First Amendment interests. But I think that the Court has drawn a clear line. It has never suggested that the mere refusal to deal or serve based on status, even with respect to an expressive association, would fail under First Amendment scrutiny. Instead, you look at a case like 303 Creative, and there the concern was about changing the message. Or a case like Hurley, gay and lesbian individuals could march. You just couldn't change the message by holding up a particular sign. So we recognize that there are going to be some applications where you'd have to conduct that kind of First Amendment analysis, but if the relevant question is, could you just bar people on the basis of a protected status from creating an account, and it's not going to affect your message. They want to lurk on X and read other people's posts. I think that that kind of law would certainly be valid. I want to briefly address, Justice Gorsuch, the question you asked about the scope of CDA preemption under Section 230. Just to be clear on this one, I want to say there are unresolved issues here. I would warn the Court away from trying to resolve exactly how much conduct CDA 230 protects and exactly how that interacts with the Texas law here. The only point I would make is that there are questions about what it means to act in good faith, questions about what it means for the platform to take down content that is otherwise objectionable, but however those interpretive disputes might shake out in a particular case, surely Texas here isn't saying that its entire law is preempted and it has no effect whatsoever, and CDA 230 fully takes care of the problem. So I think what the Court could do, not knowing exactly the scope of how that preemption issue might be resolved, is to say whatever exists in that category of speech that Texas is prohibiting, the editorial decisions it's countermanding, on the one hand, versus what CDA 230 would authorize, on the other hand, whether that's a big category or a little category, all of the things in that category constitute protected decisions by the platform that haven't been adequately justified. And I think that's all you need to say about the preemption issue in this case. If a legislative body enacts a law requiring viewpoint neutrality in some area, and it does so because it is concerned that people who express a particular viewpoint are suffering discrimination, is that law unconstitutional on the ground that the intent of the legislative body was to benefit a particular group? No, I don't think that that kind of law would immediately be unconstitutional. And again, I think if it's structured like a generally applicable public accommodations law, there might be important or significant governmental interests in being able to protect against that kind of discrimination. Unless there are any further questions? Can I do one more? Sure. Governments spend a lot of time defending net neutrality, so maybe I should have asked you this with respect to Florida's law, just given the breadth of that law, and why are Internet service providers, in your view, so different, and what if an Internet service provider wanted to make certain content distinctions? Internet service providers are fundamentally different because they are engaged in transmitting data in order to make websites accessible, and that is not inherently expressive. They're certainly providing the infrastructure, the cable, the fiber optics, and the service to make sure that you can log in on your home computer and access the Internet writ large, but along the way, they're not compiling that speech into any kind of expressive compilation of their own. So we would put them in the same category as telephone and telegraph companies or UPS, where you could say, sure, they're literally facilitating the transmission of speech, but they're not creating an expressive product that could implicate the First Amendment principles at stake. Now, then you might ask, okay, well, what if they want to start discriminating with respect to the service they're providing for particular types of websites? The kind of quintessential example of this is an Internet service provider that decides to slow down service to a streaming site, let's say Netflix, because it wants direct Internet traffic to some other website of its own choosing, maybe its own streaming service. We think net neutrality could come in there and say, you're not allowed to discriminate based on content in that way. But that's because, again, there would be no expressive speech or compilation that you could attribute to the Internet service provider itself. People don't sign up with Comcast or Verizon to give them some kind of limited curated access to the Internet. They're engaging in service with those companies because they need someone physically to transmit the data so they can get access to the whole Internet. Can I ask one? I don't have to buy anything you just said to rule for your position in this case, or anything you just said on net neutrality, right? You do not have to agree with me, Justice Kavanaugh. I hope someday, if it comes to it, to persuade you. I'm not saying, but I just want to make sure that's walled off. Nothing about the court's decision in this case would at all affect the net neutrality issue. We think that here the platforms are engaging in expressive activity. That's protected by the First Amendment, and you can leave for another day all of the kind of conduit questions that come up in the net neutrality context. Thank you. Thank you, counsel. Mr. Nielsen? Thank you. It's been a long day. Mr. Chief Justice, and may it please the court, this is not the first time that new technology has been used to stifle speech. Telegraphs also discriminated based on viewpoint, prompting a national scandal. Yet under the platforms theory, Western Union was just making editorial choices not to transmit pro-Union views. Today, millions of Americans don't visit friends or family or even go to work online. On person, everybody is online. The modern public square. Yet if platforms that passively host the speech of billions of people are themselves the speakers and can discriminate, there will be no public square to speak of. We know this because Twitter has admitted that their theory of the First Amendment would allow them to discriminate not just based on what is said on the platform, but, quote, on the basis of religion or gender or physical disability. That's not the First Amendment. That's Lochner 2.0. And as more than 40 states warned the court, the implications are gravely serious. For example, as New York explains, if these algorithms are constitutionally protected, platforms may be able to continue selling advertisers the ability to discriminate based on race. Or, as Professor Lawrence Lessig, Zephyr Teachout, and Tim Wu, who do not typically file briefs in support of Texas, caution, not just states, but Congress may be powerless to address the social media crisis devastating the lives of kids. HB 20 is a modest effort to regulate such power in the context of viewpoint discrimination. Platforms can say anything they want under HB 20, about anything. There's no limit. They can say anything they want. Users can block anything they don't want. There's no limit on that. All that's left is voluntary communications between people who want to speak and people who want to listen. This law is thus nowhere near the heartland of the First Amendment. Instead, this is democracy and federalism, not a facial pre-enforcement injunction. I welcome the court's questions. If this was so clearly within a common law tradition, as you suggest, why hasn't Congress seen fit to act as Texas has? And it appears that Mr. Clement suggests that actually Congress has acted in the opposite direction. Would you comment on that? Yeah, I don't see how, with all respect to my friend, how their reading of 230 is at all consistent with what Congress said. They have all sorts of kind of policy arguments about how 230 ought to work, but if you actually just read the words of the statute, it doesn't work. So his suggestion that Congress somehow has kicked out Texas or said that that's not how he wants to be, I don't think is consistent with the text of the statute. I didn't hear a lot of textual argument coming from Mr. Clement there. So that would be my first-line answer. My second-line answer is I have no idea why Congress does or does not do, but I do know that Texas has the ability to protect Texans, and that's what Texas has done here. Counsel, you began by saying, you know, the platforms, they want to keep out this person and that person on the basis of race or sex, and then you said that's not the First Amendment. Well, the First Amendment doesn't apply to them. The First Amendment restricts what the government can do. What the government's doing here is saying you must do this, you must carry these people, you've got to explain if you don't. That's not the First Amendment. Well, respectfully, Your Honor, the First Amendment is big. It applies in a lot of different ways. So it's true for us, like we're saying, because this isn't speech, it's conduct, we can require viewpoint neutrality. But in other cases, the same companies are saying when New York or some other state says, hey, you can't have algorithms that try to hook kids, they say, well, we have a First Amendment right to do that. It's the same First Amendment. The same First Amendment that says, I mean, if it's all First Amendment, then I guess it's going to be hard for Texas to say you have to be viewpoint neutral, but it's also going to be hard for California and Illinois or anybody else to say you can't have an algorithm that hooks kids. Because it's all the same. I'm sure it's the same for all the other states. The question is, they don't have the obligation to act in the same way that you as the state has the obligation to do. They can discriminate against particular groups that they don't like, whether it's a group that encourages kids to take the Tide Pod contest or something else. And you have different obligations. I guess a couple of ways I could respond to that, Your Honor. The easiest one I'm going to talk about is, if I may, common carriage. My reaction coming to this case was the same as yours. My reaction was, well, wait a minute. It's their own platform. You can't censor like they're private. But that's the exact same scenario that came up with the Telegraph. The idea the Telegraph was dumb pipes is not true. Instead, what the Telegraph was, they had the technological ability to say that we're not going to let this type of speech through. No, you're absolutely right, but it's kind of begging the question. You're assuming that they're like the Telegraph. It seems to me that that's a big part of what the case concerns. And I'm just not sure that the Telegraph had a particular compelling type of monopoly. I mean, if you didn't want to use the Telegraph that was there, you usually didn't have an alternative choice, whether you're talking about railroads or other types of common carriers. I'm not sure the same thing applies with respect to social platforms. So I give you my theory for why common carriage is important here. As I look at the cases, and I agree, they're really hard to figure out where conduct starts and speech ends and all of that. And you look at all the various cases this court has said. Some commentators say they can't be reconciled. I'm not sure about that. But I think it's a helpful way to think about it is we know that there is a line between speech and conduct. And we know that common carriage has always been on the non-speech side of the line, the conduct side of the line. So if this falls within the common law tradition of what is common carriage, nobody has ever thought that falls on the speech side of the line. So we can't make them say something otherwise that they didn't want to say. The whole point of it is it's a signal to the court. That's a way that the court can figure out which side of the line are we on. It turns on whether you're saying who do you want to leave the judgment about who can speak or who can't speak on these platforms. And do you want to leave it with the government, with the state, or do you want to leave it with the platforms, the different various platforms? Well, the First Amendment has a thumb on the scale when that question is asked. It does. And that's why it's important, I said, to go back to look at the history of this. Because at some point the First Amendment has to end or everything is covered by the First Amendment. This court has said that the way that we tell the difference is whether it's inherently expressive. And the court has said what they mean by inherently expressive. They talked about in Miami Herald, you're not a passive conduit. We talked about in Hurley whether you're intimately connected. Well, this court last year had a case in PAMNA where they talked about what these platforms do. And they say that they are passively connected to the speech on their platforms and that they're agnostic about the content. It's just one big algorithm that's matching things together. And I think that's important. But I also want to stress, if I may, again, this is a facial posture. And if you look at the breadth of our statute, there's the talk about whether you have to host somebody's speech. There's also about you just want to read Facebook. That is one of the provisions of our statute. You go online in the morning and you want to see what's going on in the world. According to their theory, they can stop you from doing that, too. And that's surely public accommodation law. The idea that they don't like somebody because of their race or their disability or something like that, and we're going to say we're not going to allow you onto our platform, that surely cannot be constitutional. That's what I mean by that's Lochner. That's you've gone beyond any content of the platforms themselves on their page to saying we're not going to let people even look at what we're selling. That's a bookstore saying we won't sell you our book. That's different from saying we won't publish your book. Do you think that there are any unconstitutional applications of your law? I mean, that's a hard question. I suspect that there might be. What would they look like? So, the one that comes to mind would be imagine, and this comes up in their brief, they pick the most vile example, and they say imagine a publisher didn't want to publish the book written by the Proud Boys, is the example that they use. I think you might very well have an eyes applied challenge to that. But the problem for them is they pick the most vile example when I think all of them would say, but wait a minute, surely you can let them on Facebook and you can't kick them off because their grandma said something outrageous, right? There's got to be a limit there. And that's why a facial resolution in this case doesn't work. And if it does, you have to separate the one from the other. Where's the line? That's hard, right? I would say this court struggled with that in 303 Creative because it's really hard to know when something becomes inherently expressive. And the court's cases like Dale about when is something that happened, all of those are hard cases. But in all of them, this court has had facts. It actually looked at the facts of the case and tried to figure out as applied whether that makes sense here. In this situation, there's a million applications of this law that are perfectly fine. And they pick some of the most vile possible hypotheticals, ignoring, by the way, the provision of Texas law, which they never address, which says under Texas law, if you don't want to hear content, they're allowed to make sure you never hear that content. So all you have left, I mean, again, they never mention at all. That's the focus point of our brief. They never respond to it. But that means all that's left is I don't want to hear this type of speech. I just want to hear this type of speech. And it's just voluntary communication. That's a telephone. Mr. Nielsen, you heard during the prior argument a lot of conversation about how broad Florida's law was. I read Texas's law to be more narrow in its coverage, that it wouldn't sweep in some of the examples we were using in the last argument, like Uber, Etsy. Is that, am I correct? I think that's fair, Your Honor. So what platforms does Texas's law cover? Am I right that it covers only the classic social media platforms like YouTube, Facebook? So that's what their deponent has said. The only one that they were sure that it was covered is Facebook, Twitter, and YouTube. But that's their deponent. Presumably Texas is the one who can authoritarily, if it was in the Texas courts, I mean, it's not them. They're not the ones that get to decide authoritarily what the scope of the law is. Well, correct. I mean, we would have to prove it at trial that they're subject to it. What's Texas's position about the scope of the law? Well, the law says that it applies to any platform with more than 50 million active users per month. So I'm not sure where some of the other platforms fall on that. The ones that we know are the three biggest ones fall. So you're making that judgment based on size. So it's nothing about the definition. I mean, in the last argument we were pointing out that the Florida law in defining what a platform does and how it works would encompass Uber, for example. But you're saying that you're just distinguishing this based on numbers. No, I apologize, Your Honor. There's also a separate provision which defines social media platform as a website open to the public, allowing the user to create an account, enables users to communicate with other users for the primary purpose of posting information, comments, and so on. And so is it Texas's position that that definition then covers the classic social media sites? And by classic social media sites, I mean sites like Facebook and YouTube. Yes, Your Honor. Okay, and that it would not sweep more broadly to some of these other things like Etsy. I don't think so, Your Honor. The district court thought it covered WhatsApp. Do you think that it doesn't? I don't know the answer. That's the best I can give you. I don't know. We don't have discovery into that. We have the deponent. Their own witness said these are the three that we are sure are covered. It might very well be. That's another reason why it's hard to do this on a facial basis. Because it might very well be WhatsApp, which sure looks like a telephone to me, would be covered by it. But what about, I mean, within the big three, there are some e-mail looking functions, aren't there? I mean, I appreciate that it's hard to do this because we don't have a record. But I understood that Facebook, for example, which you say would be covered, has a messenger function. Yes, Your Honor. Which looks like e-mail. So wouldn't we have to do this at the level of the functionality of these various platforms rather than at the kind of entity level? Yes, Your Honor, you would. And it's not just that. You'd also have to go through the different types of verbs included in our statute for censoring, including the one that they keep ignoring, which is the ability to receive the expression of somebody else. That's why I say you look at the text of the statute. Their theory would mean that even if you just want to lurk and just listen and see what other people are saying, they can kick you off for any reason at all. So if you have somebody who had never posted anything or their speech is identical to the speech of somebody else, their theory is, well, we can kick you off. That seems to me pretty far into the world of public accommodations. Like, you know, 303 was a narrow case. If that's what 303 means, like, boy, now we're really, really, really big. You know, hence digital locker or locker 2.0, the idea that everything can't be protected by the First Amendment. At some point, there's lines of content. Counsel, during the prior argument, which I'm sure you listened to attentively. Yes, Your Honor. There was some discussion about how difficult life will be if these injunctions are dissolved. And a parade of horribles and expenses and difficulty geofencing Texas or Florida. Can you address some of those concerns? Yes. Two answers, if I may. First, there is some suggestion that the prohibition on discrimination against Texas or a part of Texas is somehow a trap to keep state governments in. That's not true. You read the statute. That's not what it says. There's a separate provision in the statute, which is the jurisdictional hook, which is, you know, if you're doing business in Texas. And by the way, even if Texas tried to do that, there's something called personal jurisdiction that you can simply just leave a forum. That's the court's decision in Ford. So, that argument is just not true. But the other part I think is really important about this is Texas' law, what is the remedy here? It's an injunction. There's no damages here. It's an injunction. And in fact, we know that it's not going to flood the courts because the injunction against the Attorney General is limited to the Attorney General. There's private enforcement of Section 7. And we have a handful of cases because you don't get damages. So, it's hard, unless you have a really darn good case, to be able to go to court if nobody's going to get damages for prevailing, which I think matters a lot in terms of, like, what are the real-world consequences here? They're going to have some lawsuits by the Attorney General for injunctions. And if we can't prove it, if we can't prove viewpoint discrimination, they will prevail. Did you say they could stop doing business in Texas under this law? Yes, Your Honor. Of course. I mean, it's true under the law. It's also just true as a matter of personal jurisdiction. Anybody can get out of any jurisdiction. I just meant under the law. Correct. Yes, under the law, yes, Your Honor. How does that work, if you're talking about Facebook? I mean, if somebody e-mailed and all that, if they send something into Texas, are they doing business in Texas? No, Your Honor, though that would be a fun personal jurisdiction case. The answer, as I understand it, is you have to purposely avail yourself of the forum. So merely because somebody can look at your website, if you're not having some purposeful direction towards the forum, that's generally not sufficient. It's a worldwide sort of thing, and people are going to be sending stuff left and right, and you know that as the company. I'm not sure. I don't see how they can wall off Texas from the activities of the social media platform. Well, I mean, two answers. One, they can. They have the technological ability. It's called geofencing, which they can carve off. I mean, if they wanted to, they could probably carve off this building itself. They have the ability all the way down to that granular level. But again, more than that, it isn't just it shows up there. If you want to have an account with Facebook or Twitter or any of the others, there's a contractual relationship between the two. So they have customers that are in these places. And people say, well, they don't have any customers because they're not charging any money. Well, we know that if they're not charging any money, you're the product. So they're taking your data and they're selling it to the advertisers, which is why it's so important that we recognize that if this algorithm is protected by the Constitution, then they can take that data and sell it to people and have highly targeted ads based on socioeconomic characteristics. The New York Brief explains that on page 12, which I think is important and shouldn't get lost in this. They pick, again, the most vile examples, which are the fanciful things that we don't usually do in a facial posture. And they try to say, well, that means the whole law should fail. There's a whole lot of perfectly fine applications that the court needs to remember and not lose sight of. What about a terrorist speech? How's that handled? Yeah, so a few ways. The first response that I would have to that is the provision of the statute that they ignore, which is no user has to receive anything they don't want. Right. That still allows the communication of it. So that's all right. Let's go through that there. So now we're now we're most of the universe is gone. But the next level of this under Texas law, if it's illegal, they don't have to do that either. So I'm assuming that a lot of the terrorism is going to be, you know, like we're inciting you come join Hamas or something like that. No, no, no, no. Just the pro Al Qaeda kind of messages that were common. Pre 9-11, post 9-11, not necessarily incitement, but advocating. Sure. So we put aside the first two levels here. Third, they're allowed under the statute to pick any categories they want. So if they want to keep that category for which the speech falls in, that's their choice. If they want to cut that category out, they're free to do so. They just can't do some viewpoint basis. And at the end of the day, when that last clause they can't do it on a viewpoint basis. How does that work with terrorist speech? Sure. So it's hard to say with terrorist speech because you'd have to pick the category. But assume that it is, you know, Al Qaeda. You can't very well say you can have, you know, anti Al Qaeda but not the pro Al Qaeda. If you just want to say no one's talking about Al Qaeda here, they can turn that off. And the last point, this is at the very end of the game. So you've gone through all of those things. All you have left are voluntary people wanting to talk to each other. And, I mean, people say horrible things on the telephone. And that's, and I don't think we've ever thought, well, you know what, we're going to turn that off because we don't want the telephone providers to be able to say, have that sort of right to censor. If I may, with some hesitance, I want to talk about Orwell a little bit. And I say that with some hesitance. But my reaction coming to this case was very similar to yours. I looked at this and I'm like, wait a minute. These are companies. They have their own rights. We don't generally think of censorship as something from private people. It's the government. Here's how I came around on this. Maybe it will persuade you. Maybe it won't. I came around on this to say this is something further up the food chain than that ordinary level of political discourse. This is just the type of infrastructure necessary to have any kind of discourse at all. That's why I keep going back to the telegraph. This isn't, you know, the self-level of discourse where they're making the content decisions that we make our decisions based on. This is the infrastructure that we need to have any sort of discourse at all. So, if we say we want to have that type of infrastructure not have, you know, censorship on it, that would mean we'd have to have a massively increased federal government because it would have to control all the infrastructure. And then we would have, okay, now you can't discriminate based on this kind of infrastructure of how things work. That's not, I mean, that is Orwell, right? So, for me, the answer is for these kind of things like telephones or telegraphs or voluntary communications on the next big telephone telegraph machine, those kind of private communications have to be able to exist somewhere. You know, the expression like, you know, sir, this is a Wendy's. There has to be some sort of way where we can allow people to communicate. And is that just because of the modern public square? I mean, Mr. Kuhlman has said many, many, many times that there's a distinction between public and private and that that's sort of driving his analysis as to when and under what circumstances this kind of regulation can be done. And are you just rejecting that because you're suggesting that they merge in this situation given the nature of the communications? I'm not. Okay, and that's, again, you know, I'll try again to be artful. These are complicated concepts. But I think about the common carrier as a really useful tool for this court because we know that there's hard lines to draw. It's really hard to tell the difference between Fair and Miami Herald. In the application system, you kind of get down to a granular level. It's really kind of hard to tell. I think it would be helpful if the court had a compass that could kind of like give it some direction of where to draw those lines. And common law, common carriage is that compass. But are you suggesting that a common carrier, as G pointed out, could never have First Amendment-protected activity? I mean, that's why I keep going back to doesn't this have to be not at the level of entity but at the level of sort of what exactly are they doing in a particular circumstance because you just seem to say, well, these are common carriers, so everything they do is conduct, and therefore we can regulate it. And I don't know that that's the way we've ever thought about this. Well, it is how the court thought about it with telegraphs, which I think is a useful way of thinking about it. I mean, my friend in the government says, well, you know, they're just transmitting speech. But that's totally question-begging because they have the technological ability not just to do that. The reason that cell phones don't, like, screen your calls or telegraphs didn't, like— Well, Mr. Nielsen, I'm sorry to interrupt, but I think you'd agree with Justice Jackson, though, that there might be some speech that these carriers, even as a common carrier, would be their own. A hundred percent, yes. And you do have to take that function by function. Yes, and that's the other part of this law which I think is so important is to recognize is we don't say one word about what they can say. So I would kind of disaggregate the functions of what's going on here. They have the one function, which is they are creating a message. We do nothing about that. They can say whatever they want about specific posts or anything, and that's fine. But there's a separate thing that they do, which is facilitate conversations between two people, which is like a phone. I understand that. Now, one of the things that we've sometimes looked at in the past as court, I mean, in the common carrier world, is market power. Yes, Your Honor. And how do you analyze that here? On the one hand, there are network effects that one would take account of in any analysis of market power, and that might help you. On the other hand, this is a bit unlike a telegraph in the sense that there might only be one right-of-way to run the wires. There might be serious practical barriers for more than one set of wires. One can start a new platform, at least in theory, any time. Fewer barriers to entry, but market effects. Sure. So the first answer is if we are not talking about speech, if we're just in the world of conduct, then we're not talking about market power at all. And we know that because cell phones are intensely competitive markets, and yet they're still all common carriers. But let's move that aside. And now we're saying there's some sort of reason to focus on market power. It's true. This is not like the market power of there's just one bridge. But as an economic matter, there's really no difference. And I know this. Here's a simple kind of way to look at it. Twitter has its platform. There's a lot of competitors for Twitter, would-be competitors, including Threads for Meta, which is backed by one of the largest companies in the world. They invested massive amounts of money to try to break up the Twitter monopoly, and they failed miserably. So what do we do about, I mean, there's some legislative findings here about market power. What deference do we owe those, if any? I would think considerable deference, Your Honor. This is a sovereign state. We don't usually treat states like the FTC, where we subject it to, you know, arbitrary and capricious hard book review. The state is entitled to make determinations as a matter of law as to how things are. And obviously, at some point, it might be so far afield. But I sure hope that the states get, you know, some deference on such important questions from this Court. Mr. Nielsen, can I just – sorry, go ahead, Chief. This may be the same question that Justice Gorsuch was asking, but does the nature of the economy at issue matter to us? I mean, the social media platforms, the Internet, all of that stuff, an incredibly dynamic market. You know, the government, maybe not so much. And yet it's sort of an inflection point to say that the government has the authority by categorizing the members, the participants in this dynamic market as common carriers to take over extensive regulation of them, not with respect to communication, but all sorts of things. I mean, when you're talking about railroads or telegraphs, it's not just moving transportation. It's what the railroads look like, what the safety things. They have to have a whole range of things that, you know, in the Wild West economy surrounding the social media platforms and the Internet, may be totally inept. Now, you know, I don't know if it comes at a time when you need to make that transition or not, but that is a very big step when it comes to the extent of government regulation. I certainly think that's fair. My response is going to be, this is a facial pre-enforcement injunction. We should at least be able to make our showing on the facts. We're quite confident that we'll be able to show not just market power, but durable, extensive market power here. I actually don't think it'll be even all that difficult to make that showing. So to the extent that market power is a requirement, I think that they haven't shown that they're likely to prevail on the merits as to that, which is another reason why a facial injunction is just simply inappropriate. But again, that's applied case, and we're happy to litigate that. It's really hard to, what's facially, they can pick a few examples and then say the whole thing fails. Mr. Nielsen, what besides market power? I want to give you a chance to elaborate on your definition of common carrier. When you said conduct, market power, what else? Sure. So the main requirement of common carrier, this is where common carriage and public accommodations are, if not cousins, maybe twins, is it has to be open to the public, which means that it's not a private associational group or something like that. You hold yourself out open to the public with non-differentiated contracts. You have business contract with everybody. So that's the very first one. The second is it has to be the type of industry that has traditionally been regulated as such. So for public accommodation, that's your inns and your restaurants. For common carriage, that's where you're talking about things like fridges and telecommunications. But then you get into the problem of having to draw the analogy, right? I mean, the chief just called the Internet kind of like the Wild West and the Internet, and the Internet looks a lot different. And even each of these platforms has different functionalities within it. So when you call, you've got gristmills and then railroads and cable companies. Each time you encounter something new that might qualify as a common carrier, you have to make a decision. Does it fit the bill or not? Sure. So I guess I could keep going further. That's why some courts have said, well, maybe there's additional requirements that we put on common carriage. One is market power, which is not everybody says that. I don't know how that works with cell phones. But they said, well, you need market power. And the other was it has to be somewhat invested with a public interest. And here under that, we know that if it's state action to block somebody from your Twitter account, how can that not be infected with a public interest? Thank you. This is Thomas. This is Lito. This is Sue Miller. I have a problem with laws like this that are so broad that they stifle speech just on their face, meaning I think that's what the government's been trying to say. If you have a particular type of speech that you want to protect against or promote, it would be one thing to have that kind of law. But we have a company here, Discourse, who's also a direct messaging app. And there's no question that your law covers them. But they tell us that their whole business model is to promote themselves to a particular message and groups of messages. So they're not doing it indiscriminately. You're basically saying to them, if they're out there and they're a common carrier, they can't have this kind of business model. I mean, two responses, if I may, Your Honor. The first is, as to the particular company, we're only talking about the three largest, maybe more depending on who falls within the 50 million, the largest telecommunications companies on earth. We're not talking everybody else. Okay. But as to the second point. You're agreeing with them that basically this law is aimed towards them. Yes, to the largest. We've never disputed that. But even if you agree with all of that, I disagree with you, but I understand that there's still applications of this law that should be allowed to go into effect. I don't see how they can say that they can kick somebody off for off-platform speech of their grandmother. That can't be. Or because they don't like it where you live in Texas. You know, you live in El Paso and not Dallas, so you're not as valuable to the advertisers, so we're going to kick you off. Surely that can't be okay. Justice Kagan? Just a very quick one. So on the deference to the legislative findings point, my memory is that there was a trial in Turner Broadcasting. Yes, Your Honor. That's Turner, too. So, you know, maybe there'll be a Paxton, too. I'm not sure how. Right, but there wasn't just Congress said this, that's good to go. There was a trial about that, right? Sure, Your Honor. And like you said, we're happy to go to trial. That's all I wanted to ask there. And then on common carrier, if a company says we're not a common carrier, we don't want to be a common carrier. We're carrying a lot, but we're not a common carrier. Can the state make them into a common carrier? The state, that's a great question. And that was the first question I had when I came to this case. The answer is no. If you are not a common carrier, you can't suddenly become a common carrier. That's why I think it's important to think of it as a compass to kind of tell you where the line is. But I would urge the court, if you're interested, again, we've heard, you know, read Professor Volokh's article. One thing that really struck me as strange was, well, wait a minute, they have terms of service. So how can they be a common carrier? Because if you have terms of service saying you can't do this. And this court addressed that very problem. The case that he cited is New York Central v. Lockwood from 1873, where the court said you can't just get out of the duties of common carriage by contract. If you're a common carrier, you're a common carrier unless you stop opening yourself up to the public. Seems a little circular, but I'll end there. Sorry. I just want to get a clarification. So you said that Facebook could geofence and just pull out of Texas? Of course. Of course, Your Honor. Okay. Because I was just confused. Mr. Clement was pointing out, you know, that according to the provisions of the law, you couldn't. And I'm looking at 143A.002. And it says, you know, that you can't censor users' expression, ability to receive information, etc. based on a user's geographic location in this state or any part of the state. So you don't understand that to say, well, based on your location in Texas, we're not going to let you post content? Your Honor, this is one of the prohibitions of the law that they can't. Let me say it differently, if I may. There is a provision of the law, which is the jurisdictional hook, that says who is subject to this law at all. If you choose to do business in Texas, then this provision kicks in. And you can't discriminate against people after you've chosen to do business in Texas based on the status that they're in Texas. But if you don't want to do business in Texas at all, there's a separate provision and you can get out of Texas. This is the prohibition on what you can't do. If you choose to do business in Texas, you can't darn well discriminate against somebody because they're in El Paso. And doing business in Texas is what? Just allowing Facebook users to sign up in Texas? Or is it, you know, Facebook accepting ad money from Texas corporations? That question has not been resolved by any of the Texas courts. None of them have been. But as I read it, it is you have to have, you know, customers in Texas. You've entered into contractual relationships with Texans. Thank you. Justice Jackson? Justice Barrett had exactly my same thought. And I just want to clarify. So this doesn't speak, in your view, to a business decision not to offer services in Texas because, for example, their requirements are too burdensome. Instead, this is you're offering business in Texas and everywhere else, but you are prohibiting them from discriminating against people on the basis of their geography, meaning they're in Texas. Yes, Your Honor. Thank you. Thank you, Counsel. Rebuttal, Mr. Clement? Thank you, Mr. Chief Justice. Just a few points in rebuttal. First of all, as to the common carrier, the two classic elements of common carrier status are missing here. One is that you just put transmitted or carried messages from point A to point B. That's not what's going on here. We use the word in our brief and from this Court's cases, disseminate. Disseminate means to spread broadly. That means you're in the expressive enterprise business. There's zero tradition of treating entities in the expressive enterprise business as common carriers. And then the other factor is there really is like an essential facility. You know, the telephone wires used to go, the copper wire, the last mile to every house in America. So if you were kicked off Ma Bell, you were really out of luck. This is the opposite situation in the Internet where you have lots of other choices. This is just not a common carrier. Not that that really is talismanic under the First Amendment anyway. Justice Thomas made that point back in Denver carrier case, and he had it exactly right there. Now second, public accommodation. I wouldn't be worried about any other accommodation law, public accommodation law. No other public accommodation law prohibits discrimination on the basis of viewpoint and applies exclusively to speakers. That is a First Amendment red flag that you're trying to limit speakers' ability to discriminate on the basis of viewpoint. That's just a frontal assault on editorial discretion. Every other public accommodation law that I'm aware of works differently. Third point, protecting kids. If you're at all concerned about protecting kids on the Internet, that should be a vote in our favor in this case. Because if you can't do viewpoint discrimination, that disables us from doing many of the things that our companies try to do to protect youths online. I mean, the idea that, okay, we're going to have to choose between having, if we have suicide prevention, we have to have suicide promotion to avoid viewpoint discrimination. That should be a non-starter. And protecting kids is important even as to the disclosure provision. There is a record on this case at page 161 of the Joint Appendix. A witness from Stop Child Predators testified and said these disclosure provisions give a roadmap to predators to figure out why their messages aren't getting to children. So they can figure out why they got bounced and they can try again and sort of work their way around. So the last point, and I think this is an important one to end on, this idea that somehow we're behind the eight ball because we brought a facial challenge. There is a proud tradition of facial challenges to vindicate First Amendment rights in this country. That's how many of these cases have been brought. There's an equally proud tradition of getting a preliminary injunction against a law that is chilling speech. And as the General pointed out, the party presentation rules have to be foundational here. If we had gone into the district court and said this is unconstitutional on its face, and they said no it's not because of Gmail, we could have had a fair debate about that. We could have modified our complaint if necessary. That's a difficult issue. As I said, the only court that I've seen that deals with it directly said Gmail is not a common carrier. But in all events, we could have litigated all of that. But the plaintiff's burden is not to think of any theory the government can come up with appeal and then foreclose it in the district court. Thank you. Thank you, counsel, all counsel. The case is submitted.